## Hart's Appeal.   Bell's Appeal.   Hopkins's Appeal.

1. Certain citizens made subscriptions to the stock of a railroad company whose road was in process of construction. These subscribers were interested as property owners in the completion of the road. The subscriptions were to be made to the company and by the company turned over to these subscribers. The latter entered into a contract for grading, tieing and bridging a certain portion of the road at a designated cost, the subscriptions to be collected by those engaged in this work, and if more than sufficient to pay for the work, the surplus was to be returned to the company. It was further agreed that the company should give either stock or transportation notes, in payment for materials furnished and work done, to each individual subscriber in proportion to his subscription. Of the subscriptions $6000 were thus collected and work done under the contract to the amount of $9900. Further work was suspended by reason of the insolvency of the company and a sheriff's sale of its property. In the distribution of the proceeds of said sale the parties who had done the work under the above contract claimed to participate therein as creditors and contractors and to be paid out of the proceeds of the sale. *Held*, that their claims were properly rejected.

2. One who contracts to furnish five thousand ties to a railroad is not a contractor and preferred creditor under the joint resolution of 1843 of the General Assembly.

3. Sub-contractors and laborers employed by sub-contractors are not within the protection of the resolution of 1843. The Act of April 4th 1862, does not enlarge the class of persons protected by the resolution of 1843; it merely aids in the remedy.

November 19th 1880.   Before MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.   SHARSWOOD, C. J., absent.

[Hart's Appeal.]

Appeals from the Court of Common Pleas of *Washington county*: Of October and November Term 1880, Nos. 271, 273 and 299.

These were the several appeals of Brit Hart et al., Hazlett Bell and James Hopkins et al., from the decree of the court distributing the proceeds of the sheriff's sale of the property and franchises of the Pittsburgh Southern Railway Company.

Said company was chartered under the laws of this Commonwealth, to construct a railroad from Pittsburgh, Pa., to Washington, Pa., with branches. The work was begun in 1877, and the main line was connected sufficiently to enable the company to run trains through about February 1879, but the work of construction went on up to the date of the sheriff's sale. Work was also prosecuted on the southern branch of said road, extending from Virginia Junction to Hillsboro, Washington county; and this portion of the road remains still unfinished.

James Potter, on the 20th January 1879, secured a judgment in the said court against the company on proceedings to assess damages for land occupied by the said road, at No. 89 October Term 1878. From this judgment a fi. fa. was issued, returned nulla bona, and on March 10th 1879, an alias fi. fa. No. 1, May Term 1879, Eastern District, was issued, upon which all the franchises and rights of the said company in both counties was sold to James H. Hopkins for $55,000. The sale was made April 3d 1879, and confirmed April 21st 1879. On June 16th 1879, an auditor, Alexander Wilson, Esq., was appointed to make distribution, ascertain claims upon the fund, and to report distribution thereof.

Among the claims presented was that of Brit Hart and others, known as the "Hillsboro Committee," composed of citizens of Washington county, living at or near Hillsboro. This was upon a contract for the grading, bridging and tieing of four miles of the Pittsburgh Southern Railway, Southern Branch, extending from Bentleysville, Washington county, to Hillsboro, in said county.

In relation to this claim, the auditor found the following facts: "A number of citizens, including the committee whose names are signed as 'parties of the second part' to the contract of date December 21st 1877, hereinafter recited, had made subscription to the stock of the railroad company, amounting to about $7000. These subscriptions were made to the company and turned over to the committee. The committee took them and entered into the following contract with the company: 'Article of agreement made and entered into this 21st day of December 1877, by and between A. C. Hays, General Superintendent of the Pittsburgh, Castle Shannon & Washington Railroad Company (Southern Branch), of the first part, and Henry Hawkins, George Taylor, Edward Taylor, Moses Diven, Lee Kinder, Tiny Kinder, Samuel Kinder, J. D. Roberts, F. B. Winnett, J. P. Hart, Brit Hart, J. H. Hart, J. H. Evans, E. N. Myers, John Wherry, Marion Craft, Oliver Lacock,

Valentine Kinder, Ham. Myers, J. W. Leatherman, W. Warrick, of the second part, in and for the grading, tieing and bridging that part of said road intervening between a point in the. village of Bentleysville, at or on a line east and west with the Methodist Church, to a point where the grade may terminate at or near the pike, at Taylor's Summit (this being understood to mean or signify the end of cut, if one is found necessary, to be made at the pike). The parties of the first part, after receiving from the parties of the second part the above section of road, graded in accordance with location, specifications and instructions of engineers of said company, the same not to exceed the average cost of work of the Pittsburgh, Castle Shannon and Washington Railroad, already done, to furnish all ties and bridge timber, furnished at such points along line of road as same may be needed, at a price not exceeding lowest market rates, at which same class of timber can be purchased from other parties in said vicinity. Abutments for bridge or bridges to be built ready for superstructure. The superstructures for bridges to be built by parties of the second part. All work pertaining to construction of road to be done in accordance with plans, specifications, plots, surveys and instructions of engineers, or such other employees of said company as may by them be found necessary to place in charge of said work. All work to be completed by parties of the second part on or before the 1st day of September 1878. The parties of the second part also further obligate themselves, under penalty of allowing said Pittsburgh, Castle Shannon & Washington Railroad Company to proceed at once after the aforesaid date to complete the work at expense of parties of the second part; the said work complete, including bridges, to cost a sum not to exceed $3000 per mile. But if same can be accomplished for less, in accordance with specifications, then the parties of the second part to have advantage thereof; but it is understood that in the event that subscriptions taken amount to more than will be necessary to finish the work, then the surplus shall become due and payable to the.parties of the first part, as per conditions and agreements contained in the subscription books of the company, which shall govern collections of all subscriptions. The parties of the second part hereby agree to indemnify said company, and furnish bondsmen as required by law, in case right of way is contested by any individual through whose property said line may be located; but are not to be subjected to attorneys' fees in litigating same. they to be paid by company of first part. In consideration of the foregoing, the parties of the first part hereby agree to put their engineers on the work and have same located ready for grading on or before February 1st 1878, and further agree that they will complete the road: namely, lay the ties, put. on the iron and rolling-stock, or in other words, put the road in running order, within 60 days from date of completion of grading, unavoidable delays and

detentions excepted.   The parties of the first part, in payment for material furnished and work done, hereby agree to give either stock or transportation notes on said road to each individual subscriber in proportion to their subscriptions, as follows : all work and material to be subject to approval of parties of the first part, and to be paid for in the following manner : at the rate of (15) fifteen cents per cubic yard for earth ; (25) twenty-five cents per cubic yard for loose rock and shale, and (40) forty cents per cubic yard for solid rock.   All estimates for work done to be made by engineers of the Pittsburgh, Castle Shannon & Washington Railroad Company.   It being agreed between the parties of both parts that this contract is to terminate at centre of National pike, instead of mouth of cut at Taylor's Summit, at the grade established by engineer at that point.   In witness whereof, we have hereunto set our hands and seals the day and date above written.'

" The committee have collected about $6000 of these subscriptions, and have done work under the contract to the amount of $9900.72.   The work was commenced a little before harvest, in June of 1878.   By the terms of the contract, the work was to be finished on or before the 1st day of September 1878 ; but F. G. Kammerer, Vice-President of the company, by letter dated October 8th 1878, addressed to Mr. Hart and received by him, stated the inability of the company to procure iron for road on time and their failure to effect an arrangement for ' issuing a bonded indebtedness to cover the amount of the iron,' and recommended ' a suspension of work awaiting further development,' and stating that a meeting of the stockholders had been called for December 14th, at which time a vote would be taken on the subject.   The work, however, was not stopped.   Specifications were subsequently furnished the committee as long as the work progressed.   The work went on up to the time of the sheriff's sale.   Mr. Hart says in his testimony, ' work was resumed in a short time after Mr. Kammerer's recommendation was received and kept on until the sale, or as long as the company furnished an engineer ;' and he says ' he thinks no work was done after the sheriff's sale,' and that ' the work is not completed yet.'   At the time of the sheriff's sale, work to the amount of about $2000 remained to be done ; that is, $2000 more would have completed the work.   After the sheriff's sale of the Pittsburgh Southern Railroad to James H. Hopkins, the Pittsburgh Southern Railway was organized with Mr. Hopkins as its president, and on the 26th day of August 1879, Brit Hart and ten others of those who were parties of the second part to the aforesaid contract of December 21st 1877, with five others whose names were not to that contract, entered into an agreement in writing with the Pittsburgh Southern Railway Company as follows :—

" ' Whereas, it is considered of great importance to the people on and near the surveyed route of the Pittsburgh Southern Railway,

that the road be extended as rapidly as possible, and whereas the proposed route has been divided into sections, and efforts have been and are being made to secure the co-operation of the people interested in each section with the corporation authorized to build said railway: Now, therefore, it is hereby agreed by and between Brit Hart, H. B. Myers, E. U. Myers, L. M. Kinder. Oliver Lacock, Valentine Kinder, J. P. Hart, W. S. Myers, S. L. Kinder, J. H. Evans, J. G. Hart, W. W. Warrick, George Crumrine, Jacob Myers and G. Taylor, as parties of the first part, and the Pittsburgh Southern Railway Company of the second part; that the said parties of the first part will complete the grading, bridging and trestling upon all that portion of said route lying and being between Bentleysville, Washington county, Pa., commencing at a point in said town where the adjoining section terminates, and a point in Hillsboro, already fixed by the contracts for grading, &c., and to furnish along the line of said section at proper points for construction, sufficient ties for the same; all to be done according to the specifications furnished by the late company, and under the supervision of the chief engineer of the said party of the second part, and the work to be done without delay.

" In consideration whereof, the said Pittsburgh Southern Railway Company agrees to issue to said parties of the first part, and to such persons and in such proportion as they may designate shares of the common stock of said Pittsburgh Southern Railway Company, fully paid and at par, sufficient to pay for all work done and material furnished under contract with the late company, and all work done and materials furnished under this agreement, the same to be estimated by the said engineer, at the same rate and prices as agreed upon with the late company.

" And the Pittsburgh Southern Railway Company further agrees that as soon as this agreement is executed, and similar agreements are executed, covering the whole line between Virginia Junction and Hillsboro, and the work is actually begun, it will at once arrange for the purchase of sufficient iron to lay the rails on said extension, and as the same is completed to Kammerers, commence to lay said track; and as the same is completed beyond, to continue the same to completion and to provide transportation for persons and freight, as provided by law, as soon as possible.

" In witness whereof, the said parties of the first part have hereunto set their hands and seals, and the said corporation affixed its corporate seal, with the signature of its president, this 26th day of August 1879.

" Neither certificates of stock or transportation notes were issued by the Pittsburgh Southern Railroad Company to the committee or subscribers. Mr. Hart, in his testimony, says 'it was never agreed at any meeting of the committee that ever I was at, that the committee would take stock or transportation notes.'

[Hart's Appeal.]

"Messrs. Wright and Aiken objected to this claim for the following reasons :—

"1. The evidence adduced shows that the claim should be reduced from the amount claimed, by whatever subscriptions were made to the road and assigned to the committee ; and should be reduced in addition by the amount of unfinished work at the time of the sheriff's sale of the road.

"2. The agreement, as testified to, between the Pittsburgh Southern Railway Company and the Hillsboro committee, is a complete satisfaction of any claim they might have against the old company.

"3. As payment was to be made in stock or transportation notes of the old company, no claim can be made on the distribution before the auditor.

"4. The work not having been completed, and as no payment in transportation notes or stock was to be made until the work was fully completed, the claim cannot be allowed by the auditor.

"It was agreed between Mr. Gow, representing the committee, and Messrs. Wright and Aiken, that transportation notes, such as the company were issuing to other parties, were in the following form :—

TRANSPORTATION NOTE.

Pittsburgh, Pennsylvania,
On the          day of          A. D. one thousand eight hundred and eighty-eight,
          The Pittsburgh Southern Railroad Company,
Promises to pay                                        the sum of
                                                      $\frac{}{100}$ Dollars,
with interest at the rate of six per centum per annum, said interest payable semi-annually upon presentation of this note to the treasurer of said company, at Pittsburgh, Pennsylvania, on the first days each of May and November, of each year following the date hereof.

"It is understood and agreed, however, between the said company and the holder hereof, that at any time, and from time to time, upon presentation of this to the treasurer of said company, at Pittsburgh, Pennsylvania, the said holder shall be entitled to receive an order in amounts demanded (the aggregate not to exceed in any one year one-tenth part of the principal hereof, and the interest due hereon from time to time, and in amounts not less than five dollars, and the amounts of such orders to be credited hereon), for the transportation over the railroad and branches of said company, of such freights and passengers as are connected with his or her immediate business or household, at the regular schedule of rates, and under such rules and regulations as may, at different times, and from time to time, be fixed and established by said com

pany, the amount of all such orders to be applied, first to the payment of interest due or falling due, and to bear interest to said company from its date.

President.

Secretary and Treasurer.

On the back of the note are the following forms:

For value received · · hereby transfer, assign and set over unto · heirs and assigns, the balance of said note remaining unsatisfied at this date.

Witness hand and seal this day 18
Sealed and delivered in presence of (SEAL.)

I, the holder of the within note, at the dates set opposite my name, acknowledge credits thereon as follows:
Date, Amount, Name, * * *

In reporting upon these facts the auditor said:

"What is the fair construction of the contract of December 21st 1877? The citizens who entered into it wanted the railroad. Doubtless, as Mr. Justice GORDON says, in Miller v. Hanover Junction & Susquehanna Railroad Co., 6 Norris 95, they were 'persons interested not so much in the stock as a marketable and valuable article, as in the proposed improvement, as something that would promote their individual welfare; persons of the indicated vicinage agreeing together (under certain conditions proposed to them by the railroad company) to join in the promotion of a common enterprise intended mediately if not immediately for their mutual benefit.' Subscriptions had been made to the stock of the railrord company by these claimants to the amount of about $7000. Instead of paying these subscriptions to the company in money and letting the company use the amount in building the four miles of road, the committee took the subscriptions and agreed to grade, tie, and bridge the road. If this claim were allowed these subscribers to the stock of the company would stand in the position of parties who had subscribed $7000 to the stock of the company to be used in building the branch, now getting the amount subscribed back in money, dollar for dollar; indeed perhaps more than dollar for dollar, because an advantage was given to the committee in the estimate of the work; for Mr. Hart in his testimony says: 'The Hillsboro committee was to be paid on the estimate of the engineer at one price, and the engineer also made out another estimate at a different price from which the committee paid their contractor.'

"What is a subscription to the stock of a railroad company? It creates a debt against the subscriber, it is as much an engagement to pay the money as any other engagement for the payment of

money: Pittsburgh & Conn. Railroad Co. v. Clarke, 5 Casey 146; Graff v. Pitts. & Steub. Railroad Co., 7 Id. 489.

"What is the stock of a railroad corporation? It is thus defined by Mr. Justice SHARSWOOD in Neiler v. Kelly, 19 P. F. Smith 403. 'A share of stock is an incorporeal, intangible thing. It is a right to a certain proportion of the capital stock of a corporation, never realized except upon the dissolution and winding up of a corporation, with the right to receive in the meantime such profits as may be made and declared in the shape of dividends.'

"Mr. Hart in his testimony says the company assigned the subscriptions to the committee 'and we were to build the road, and then they were to furnish stock or transportation notes to the individual subscriber in proportion to their subscriptions; if the cost of the road exceeded the subscriptions the committee were to receive stock or transportation notes for the excess, and if the subscriptions exceeded the cost the committee were to turn the surplus over to the company.' The claim now is that because the railroad has been sold by the sheriff, these claimants can carry away from the proceeds of sale, which are a fund to pay the debts of an insolvent corporation, the full amount of the work done, in other words the claim is that as the company has been sold out before the subscribers and committee received certificates of stock or transportation notes they must be paid in money out of the proceeds of this sale. If the claimants were entitled to receive stock and the company were still solvent the delivery to them of the certificates thereof is all that the corporation would be bound or competent to do. If the company had violated the agreement by refusing to deliver the certificates of stock, then perhaps an action for damages might have been maintained against it, but that is all. It was held in Arnold v. Suffolk Bank, 27 Barb. 424, that an action for money had and received will not lie against a corporation by one who has subscribed for a certain number of shares of stock and paid for them, merely on the ground that the company refused to deliver the certificates. The claimants here are seeking to be paid in money to the full value of the work done because, as they say, they have not received certificates of stock which, if they had received them and the corporation was solvent would only entitle them to such dividends as might be made by the corporation, and could not be realized except upon its dissolution and winding up. It was urged on behalf of these claimants that their claim to participate in the distribution of this fund is strengthened by the fact that by the contract the railroad company were to give them either stock or transportation notes in payment for work done.

"As the choice between stock and transportation notes was never exercised, it is of course impossible to say how many of the claimants would have taken certificates of stock and how many transportation notes, or what proportionate amount of either each one

. [Hart's Appeal.]

might have taken. The contract is silent as to which one belongs the right of choice, but assuming for the sake of the argument that the committee and subscribers on the completion of the road, would have had the right to choose which they would take, certificates of stock or transportation notes, how does that better the claim? What are transportation notes? They are what their name imports. Notes payable not in money but in transportation over the railroad, of such freights and passengers as are connected with the holders' immediate business or household at the regular schedule of rates, under such regulations as may from time to time be fixed by the company—to an amount not exceeding in any one year the tenth part of the principal and the interest due. If the holder of one of these notes were refused transportation over any portion of the railroad, what would be his remedy? Simply an action for the breach of the contract. What would be the measure of the damage? Would it be the amount of the fare at the then established rates for the distance over which the company had refused to transport him, or compensation for the loss to be measured by some other standard? If these claimants had received transportation notes and were now presenting them here for allowance out of this fund, your auditor is of the opinion that they could not be allowed, as he does not regard the holders of transportation notes as entitled to participate in this distribution. If the claimants had received certificates of stock they would have no claim upon this fund for the value thereof. How then can they ask to carry away from the other creditors $9900.72 because they have not received the certificates. Your auditor for these reasons is of opinion that this claim for $9900.72 is not entitled to be paid out of the fund, and he deems it unnecessary to express any opinion as to the legal effect of the contract of August 26th 1879, with the Pittsburgh Southern Railway Company."

## BELL'S APPEAL.

In Bell's claim the auditor, inter alia, reported,

" H. M. Bell presented a claim for $650 for railroad ties furnished to the company, this amount being found due to him on settlement with the company. In relation to this claim your auditor finds 'that the ties were furnished by Mr. Bell to the Pittsburgh Southern Railway Company, under a contract in writing, of which the following is a copy:

" Article of agreement made by and between the Pittsburgh Southern Railway Company of the first part, through its agent, F. G. Kammerer, and H. M. Bell, of Claysville, Pa., of the second part. The said party of the second part agrees to deliver at the Baltimore and Ohio Railroad depot, at Washington, Pa., on or before the first day of October 1878, five thousand railroad ties

[Hart's Appeal.]

(5000), size 5 × 8 inches; six feet long; of good, sound white oak timber, or other timber of equal quality as to durability; all ties to be subject to inspection and approval of the chief engineer of said company, or such other inspector as he may appoint for that special purpose. Should the company prefer to have timber cut into trestling or in any other shape than above, the said party hereby agrees to cut and deliver as he may be ordered, providing, however, that said order is given before logs are cut off into lengths. In consideration whereof, said company of the first part agrees to pay said party of the second part at the rate of twelve and fifty one-hundredth ($12.50) dollars per thousand feet, board measure, delivered as above specified.

"'Payment to be made as follows: One-fourth or three and twelve one-hundredth dollars per thousand feet, B. M., as work progresses. One-fourth or three and twelve one-hundredth dollars when work is completed, and the balance of one-half or six and twenty-five one-hundredth dollars per thousand feet, B. M., in the company's endorsed notes, at six months, date from time of completion of job, same to bear interest from that date.

"'In case the said party of the second part agrees to put in a larger quantity of lumber than above specified, the parties of the first part agree to give an additional length of time not exceeding one month or the first day of September, and the party of the second part agrees to advise party of the first part as to his ability to put in a larger number or quantity within ten days from this date.

"'Signed, sealed and delivered this twenty-seventh day of July A. D. 1878.

The Pittsburgh Southern Railway Company,

Witness:      By F. G. KEMMERER, General Agent. [SEAL.]
     JOHN W. CREIGH.           H. M. BELL. [SEAL.]'

"Your auditor is of opinion that this was nothing more than a contract to sell to the company a quantity of ties, and would stand upon no higher ground than a sale to the company by a merchant of any other kind of materials to be used by the company in the building of their road. A contractor within the meaning of the Resolution of 1843, is one who has a contract with the company to construct the whole or some portion of the improvement. Mr. Bell was not employed to construct any portion of this railroad, and your auditor finds that he was not a contractor within the meaning of the said resolution, and that this claim is not entitled to any preference."

[Hart's Appeal.]

## HOPKINS'S APPEAL.

In the claims of Hopkins and others the auditor, inter alia, reported :

" Claims to a large amount were presented by contractors, laborers and workmen for work and labor done by them for the company in the construction of the railroad, and it was claimed that these must be paid in full.

" The question in relation to the distribution of the proceeds of the sheriff's sale of the property and franchises of a corporation arose in Bayard's Appeal, 22 P. F. Smith 453, and it was held in that case that the proceeds were to be distributed among the creditors, as in case of insolvency ; that the levy under the execution does not create a lien upon the property seized. The court in that case held that in superseding the remedy of sequestration the legislature did not intend to do away with the rule of distribution established by the original act, but substituted in lieu of that remedy that of sale by execution, not repealing the provision in regard to distribution, and the execution creditors were not entitled to be paid out of the proceeds of sale by reason of any priority of lien incident to the seizure in execution ; that the purpose of the act was to convert the property into money for the payment of its debts, and to make distribution thereof among the creditors according to the equitable rule in insolvency, and, therefore, no lien attached by the seizure, as in case of a domestic attachment, the attaching creditors acquire thereby no advantage or preference over the non-attaching creditors in the distribution of the proceeds ; that the remedy by execution was intended to provide a speedy mode for winding up the affairs of a corporation for the benefit of its creditors.

" But in Bayard's Appeal, *supra*, the question of the right of contractors, laborers and workmen to be paid in full for work and labor done by them for the company in the construction of their improvements, out of the proceeds of the sheriff's sale was not before the court.

" In the case now before your auditor it was argued that these classes of claimants were entitled to be paid in full under the provisions of the Resolution of 21st January 1843 (Pamph. L. 367), and its supplement of 4th April 1862 (Pamph. L. 235), and also that the claims of the laborers and workmen are protected by the provisions of an act entitled ' An Act for the protection of the wages of mechanics, miners, laborers and others, approved the 9th day of April 1872.' (Pamph. L. 47.)

" Your auditor is of opinion that, under the interpretation given by the Supreme Court to this Act of April 9th 1872, it does not afford protection to the claims of laborers and workmen employed in the construction of a railroad. The court in Allen *v.* Fehl, reported in 33 Leg. Int. 366, say : ' The words of the act are any

work, mines, manufactory or other business where clerks, miners or laborers are employed, and the lien is given for the labor and services rendered by any miner, mechanic, laborer or clerk ; and the words 'other business' in the act refer to some business *ejusdem generis* as 'works, mines or manufactory' where 'clerks, miners, mechanics and laborers' are employed."

"Are the contractors, laborers and workmen who were employed by the Pittsburgh Southern Railway Company in the construction of their railroad entitled to be paid in full out of the fund now for distribution, for the amount due them by the company as such contractors, laborers and workmen in the construction of the railroad, under the provisions of the Resolution of 21st January 1843, and its supplement of 4th April 1862 ?

"The resolution of 1843 is as follows : 'It shall not be lawful for any company incorporated by the laws of this Commonwealth, and empowered to construct, make and manage any railroad, canal or other public internal improvement while the debt and liabilities, or any part thereof incurred by the said company, to contractors, laborers and workmen employed in the construction or repairs of said improvements remain unpaid, to execute a general or partial assignment, conveyance, mortgage or other transfer of the real or personal estate of the said company, so as to defeat, postpone, endanger or delay their said creditors, without the written assent of the said creditors first had and obtained, and any such assignment, conveyance, mortgage or transfer shall be deemed fraudulent, null and void as against any such contractors, laborers and workmen, creditors as aforesaid.' The supplement of 4th April 1862, is in these words : Whereas, it frequently happens that incorporated companies, by assignment, conveyance, mortgage or other transfer, divest themselves of their real and personal estate in contravention of the provisions of the Resolution of January 21st 1843 ; therefore, be it enacted, that whenever any incorporated company, subject to the provisions of the above resolution, shall divest themselves of their real or personal estate contrary to the provisions of the said resolutions, it shall and may be lawful for any contractor, laborer or workman employed in the construction or repair of the improvements of said company, having obtained judgment against the said company to issue a scire facias upon said judgment with notice to any person or to any incorporated company claiming to hold or own the said real or personal estate, to be served in the same manner as a summons upon the defendant, if it can be found in the county, and upon the person or persons or incorporated company claiming to hold or own such real estate ; and if the defendant cannot be found, then upon the return of one *nihil* and service as aforesaid on the person or persons or company claiming to hold or own as aforesaid, the case

to proceed as in other cases of scire facias or judgment against terre tenants.'

" To the argument that the claims of contractors, laborers and workmen here are entitled to be paid in full under the provisions of these enactments, the reply was that they only protected such claims against a general or partial assignment, conveyance, mortgage or other transfer of the property of the company, and that in this case the property was neither assigned, conveyed, mortgaged or transferred ; in other words, that the provisions of the act do not extend to any cases except to those where the property is disposed of by the direct voluntary conveyance of the company.　But the provisions of these acts are remedial, and designed to protect meritorious classes of persons—those by whose toil canals, railroads and other public improvements are constructed.　It is neither a wise nor a safe rule of construction to adhere too closely to the letter, as was said by Mr. Justice CHAMBERS in the Commonwealth v. Fraine, 4 Harris 163 : ' Statutes are to be construed so as best to effectuate the intention of the maker, which may sometimes be collected from the causes or occasions of passing the statutes, and when discovered it ought to be followed with judgment and discretion, though that construction may seem contrary to the letter of the statute.'　And he further says : ' Such construction ought to be put on it as does not suffer it to be eluded.'

" Undoubtedly the intention of the law-maker in enacting the resolution of 1843 and its supplement of 1862, was to fully protect the claims of contractors, laborers and workmen.　They are entitled, acts to protect contractors and laborers.

" Mr. Justice GORDON, in Pennsylvania and Delaware Railroad Co. v. Lauffer, 3 Norris 168, speaking of these acts says, that ' in all statutes of this kind the intent has been to protect a class of persons who are wholly dependent upon their manual toil for their subsistence, and cannot protect themselves.'　An attempt was made in the case of Fox v. Seal, 22 Wall. 424, to have a literal construction put upon these acts, when it was argued that contractors, laborers and workmen were to be protected only against an assignment, mortgage, conveyance or other transfer of the property intended to defeat the claims.　But the Supreme Court of the United States refused to adopt any such literal construction. An examination of the opinion of the court in Fox v. Seal, *supra*, delivered by Mr. Justice STRONG, will show that these claims were regarded as of the highest character.　He speaks of the resolution as substantially giving to the contractor a lien of indefinite duration.　He says : ' It was not a *jus in re* nor a *jus ad rem*, but it was a charge upon the property, a right to prevent any disposition of it by which it could be withdrawn from the creditor's reach, and, therefore, in a very legitimate sense an equitable lien.'　He says : ' It is a superior right to have the property of the company

applied to the payment of the debt due him, as a debt, which as long as it remains due and unpaid is entitled to the benefit of the statutory privilege in whatever shape the debt may be ; a lien which, as there is no statutory limitation to it, remains so long as the debt remains unsatisfied."

" And in Shamokin Valley & Pottsville Railroad Co. *v.* Malone, 4 Norris 25, Mr. Justice SHARSWOOD speaks of the debt as a paramount and a perpetual lien until it is paid.

" It is manifest that the law makers intended to give to these claims the most ample protection.   To say that it was intended to protect them only against an alienation by the company in the literal form of an assignment, mortgage, conveyance or other direct transfer, is to make the protection depend upon some positive act of the company.   The logical result of such a construction would be that these claims would not be better than any other debt, unless the property of the company should be aliened or transferred by some direct conveyance.   Would it not be a more reasonable and benign interpretation of the act to say that the legislature intended to make these claims good, even against the property in the hands of a bona fide alienee or mortgagee.   If the absolutely literal construction contended for is to prevail, how easily the protection intended by the act might be swept away and the company be enabled to defeat the very object of the law, by doing indirectly that which it is forbidden to do directly.   A judgment might be confessed and the property and franchises of the corporation be sold by execution process, and the same argument be made to defeat the payment of the claims of contractors, laborers and workmen, out of the proceeds of the sale, to wit: That a judgment is neither an assignment, conveyance, mortgage or transfer.

" How stood the law, prior to 1843, in relation to the collection of claims against an insolvent corporation ?   The remedy was by sequestration, and it is said claims were to be paid in conformity with the rules established in cases of insolvency of individuals.

" In Steiner's Appeal, 3 Casey 313, when the property and effects of the Youghiogheny Navigation Co. were sequestered for the benefit of creditors, the fund for distribution was given to Mr. Larimer's mortgage which had been authorized by statute.   Equality of distribution is intended to be promoted by a general assignment for the benefit of creditors, and it might be said that the estate of the assignors is to be distributed pro rata, and yet inserted among the very laws providing for, and regulating such assignments, are acts giving preference to the wages of miners, mechanics and laborers.   So there are other acts giving preference to the claims of certain laborers, in cases of the insolvency of their employers, and Mr. Justice STRONG says in Fox *v.* Seal, *supra,* that it is ' not against the policy of the state to create a statutory lien in favor of laborers and workmen.'   The assets of an insolvent corporation

[Hart's Appeal.]

are a fund for the payment of their debts. Here are acts which impress the claims of contractors, laborers and workmen in the construction of a railroad with so high a character as to hold them good even against bona fide holders of the property. Here are the proceeds of the sale of the property of a railroad company now for distribution. Shall these claims be put upon the footing of all other debts against the company, because the company did not alien the property by an assignment, mortgage, conveyance, or other transfer? Your auditor is of the opinion that the claims of contractors, laborers and workmen, who were employed in the construction of the Pittsburgh Southern Railway should be paid in full.

"Your auditor finds that the persons named in schedule hereto attached, were contractors employed by the Pittsburgh Southern Railway Company in the construction of their railroad, and that the company is indebted to them as contractors in the amounts set opposite their names for the construction of said railroad, and these amounts are allowed in full. In the case of Jones and Hopkins, your auditor would say, that while there was an attempt made by the company to show that the indebtedness to them was not nearly so large as was claimed, there was no legal proof offered to reduce the amount below that now found by your auditor to be due them."

The court overruled all the exceptions to these several reports, and made a *pro forma* decree confirming the reports in order that the cases might be heard at once in the Supreme Court, at Pittsburgh. From this decree these appeals were taken.

*John L. Gow*, for appellants, Brit Hart and others.—The agreement was executory; that in consideration of the completion of the work, the appellants were to have the option in the future and at the proper time, to say whether they would take in payment, stock or transportation notes. Since the appellants had the right to choose transportation notes, by such choice they would become creditors of the company, as a transportation note holder is a creditor of the company. Hence, as the contract gave them the right, on the completion of the work, when their option should be exercised, of becoming creditors, their right cannot be impaired or lessened by any wrongful act of the company, or because the franchises and property of the road were suffered to be sold. By thus suffering the road to be sold at sheriff's sale, thereby defeating the contract and depriving us of its benefits in the specific shape contracted for, any rights that we possessed before and at the time of the sheriff's sale now survive to us; and as it would be a vain and useless demand to ask for that which has been irrevocably destroyed and extinguished, we have no remedy but to claim simply as creditors against this fund, which is all the redress left to us; and which fund is all that is left of the Pittsburgh Southern Railway Company. Had we received stock certificates, we could claim

15 NORRIS—24

nothing. Had we received transportation notes, we would be creditors. If we had the right under the contract to choose to be creditors, we have the right to claim as such now. Further, the contract cannot be specifically performed as was claimed on argument below, for our contract was for stock or transportation notes when the work should be completed, at such time when the stock or transportation notes would have a value; not for stock or transportation notes in a concern that ceased to exist on the day of the sheriff's sale. And therefore the damages claimed are for actual compensation from this fund to the amount of work done and material furnished, viz. : $9900.72, being the amount of work done as measured by the company's agent at the contract price.

*Thomas C. Lazear* and *W. F. Wright,* for appellees.—We submit that the committee were entitled to the amount of stock or transportation on October 1st 1878; and their failure to demand payment at that time shows that they were in default as to their rights, and that they did not regard themselves as being creditors of the railroad company, by virtue of their being entitled to transportation notes. But suppose the Hillsboro committee were entitled to transportation notes instead of stock, and as such were now claiming out of the fund for distribution. Could the auditor have allowed them a pro rata (for this is all they would have been entitled to) with other unsecured creditors? The auditor held that these claimants would not have been entitled to participate in the distribution of this fund. even though transportation notes had been issued to them. Simply because such a note is payable not in money but in the transportation of "such freights and passengers as are connected with his or her immediate business or household." If such transportation became impossible—by reason of the insolvency of the railroad company—the holder of the note would have to. bring an action for the breach of the contract. Until his damages were ascertained and liquidated by a judgment, he could not claim, as against bona fide creditors, a share in the estate of the insolvent. The auditor very properly ruled that claims of this character were not debts against the railroad company of sufficient certainty to entitle them to payment. He could consider such persons only as were creditors of the railroad company. We contend that holders of transportation notes are not creditors until after the breach becomes final—by refusal or failure of the railroad company (in consequence of their insolvency) to furnish the transportation, and the claim for damages for the breach of the contract has been liquidated by a judgment.

*Crumrine & Murdoch,* for appellant, Bell.—A contract to supply ties and ballast is one not to be performed, like a contract for the sale of merchandise, in a ten minute's talk, but may require a long

[Hart's Appeal.]

period of time, during which the obligation to perform continues. We cannot see why such a contractor is not entitled to the protection of the resolution; for is he not aiding in the construction of the road by his labor and means, just as much as one who contracts with the company to do a section of grading, and performs it by his own employment and payment of laborers, who remove the rock and earth from a cut into a fill?

We submit that a construction, which would limit the protection given to a contractor, to one who has graded the road bed or a portion of it, would be too constrained.

*Thomas C. Lazear* and *W. F. Wright*, for appellees.—This claim, as is well stated by the auditor, is nothing more than a contract to sell 5000 cross-ties or trestling, as the company may elect, to the Pittsburgh Southern Railway Company, at $12.50 per thousand feet, board measure; and we cannot see that it stands on any higher ground than a sale by a merchant of any other kind of materials, to be used in the construction of the road. If this court were to accord with the views of the learned counsel for the appellant in this case by holding that Mr. Bell was a contractor within the meaning of the resolution of 1843; and, that by virtue of said resolution, he would be entitled to a preference, then the claims for hardware furnished the railroad company and used by them in the construction of the road, are on the same footing.

*Thomas C. Lazear* and *W. F. Wright*, for appellants, Hopkins and others.—Our assignments of error are intended to raise but two questions. 1. Are the contractors, laborers and workmen employed in the construction of defendant's road, entitled to a preference over general creditors of the company? And 2. Are the laborers and workmen employed by the contractors (not being employees of the company) entitled to be paid anything out of the fund for distribution? The auditor decided the first of these questions in the affirmative, and this decision he based upon his construction of the joint resolution of the General Assembly of January 21st 1843, and its supplement of April 4th 1862. But it is submitted that such a construction is not warranted either by the letter of the statute or by any of the adjudicated cases, wherein it became necessary to apply it and determine its meaning.

All these cases, beginning with Fox v. Seal, 22 Wall. 424, and including those which followed it in this court, to wit: Tyrone & Clearfield Railroad Co. v. Jones, 29 P. F. Smith 60; The Pennsylvania & Delaware Railroad Co. v. Leuffer, 3 Norris 168; and Shamokin Valley & Pottsville Railroad Co. v. Malone, 4 Id. 25; to which may be added, Pittsburgh, Cincinnati & St. Louis Railway v. Marshall, Id. 187, were, with one exception, cases involving the question whether mortgages made by these railroad companies

were of any validity as against debts due to contractors which had been incurred by the companies before the mortgages were executed; and the excepted case, to wit: The Pennsylvania & Delaware Railroad Co. *v.* Leuffer, *supra,* presented the question, whether an engineer was within the protection of the resolution of 1843, so as to entitle him to enforce his claims for services by scire facias, under the Act of 1862, against the lessee of the original company by whom he had been employed. It will be observed, therefore, that every one of these cases was the case of a direct transfer or alienation of the property of the company by the voluntary act of the company itself, and so was clearly within the provisions of the resolution of 1843. But in the case now under consideration, the company did nothing prohibited by the resolution. It executed no " general or partial assignment, conveyance, mortgage or other transfer of its real or personal estate." True, the sale which produced the fund for distribution operated as a transfer, but it was not a transfer in which the company had any agency, and, therefore, was not within the plain meaning of the resolution or its supplement, both of which contemplate volition on the part of the company in the disposition of its property.

The allowance of the claims embraced in the schedule attached to the auditor's report, being the claims of laborers and workmen employed, not by the company, but by the contractors, was clearly error. The resolution of 1843 did not authorize such allowance, for the claims contemplated by it and within its protection are " debts and liabilities or any part thereof incurred by said company to contractors, laborers and workmen employed in the construction or repair of said improvement."

*Thomas H. Baird,* for appellees.—These claims were made and urged as under authority of the joint resolution of January 21st 1843, entitled, " Resolution to protect laborers and contractors," and " Supplement to a resolution to protect laborers and contractors," &c., approved April 4th 1862. The purpose of these acts was, that the great numbers of persons employed temporarily and in large companies, in the work of constructing railroads—who put their personal, manual labor into the very erections and improvements themselves, and who, from their poverty and want of acquaintance with business requirements, were totally unable to protect themselves by special contracts, should be rendered secure of their hard-earned remuneration—so necessary for the current support of themselves and their families. (See opinion of GORDON, J., in Penna. & Del. River Railroad Co. *v.* Leuffer, 3 Norris 168.)

By construing these two acts together, as one act, as the law requires, they being *in pari materia,* we find that a remedy or mode of carrying out this intention of the legislature is fully recog-

[Hart's Appeal.]

nised. In the supplementary Act, it is provided that upon violation by any company of the provisions of the prior resolution, "it shall be lawful for any contractor, laborer or workmen employed in the construction or repair of the improvement of said company, having obtained judgment against the said company, to issue a scire facias," &c. Does not this language plainly import, that any of the classes of claimants described can bring suit directly against the company upon whose improvement the work has been done, and obtain judgment? And the subsequent provisions for proceeding against the transferree, "as in other cases of scire facias on judgment against terre-tenants," can have no other meaning than that, in the legislative intention, a lien already existed against the property prior to its transfer.

Mr. Justice PAXSON delivered the opinion of the court, January 3d 1881.

The above appeals being from the same decree, may be considered together. I will discuss them in order.

1. HART'S APPEAL. This appeal has but a single assignment of error that needs to be considered. It is that the court erred in not sustaining the following exception to the auditor's report: "That the auditor erred in not allowing the claim of the said committee, contractors for the construction of the Southern Railway Company, for the full amount of their said claim, viz.: $9950.72." The auditor rejected the whole of this claim, which ruling was affirmed by the court below. It is proper to say that the decree was entered *pro forma* to enable the parties to have the case heard at the last term of this court, in the Western District. We are, therefore, without the aid which the opinion of the learned president of the Common Pleas would have given us.

The question arose upon the distribution of the proceeds of a sheriff's sale of the property and franchises of an insolvent railroad corporation. The appellants had constructed a portion of said road under the following circumstances, as we gather from the auditor's report: A number of citizens, including the committee referred to, had made subscriptions to the stock of the Pittsburgh Southern Railway Company, amounting to about $7000. These subscribers were interested as property owners in the completion of the road. The subscriptions were made to the company, and by the company turned over to the committee and those with whom they acted. The committee took them, and entered into a written contract with the company, dated December 21st 1877, for the grading, tieing and bridging of a portion of the road therein designated, at a cost not to exceed $3000 per mile; the subscriptions to be collected by the committee, and if more than sufficient to pay for the work was realized therefrom, the surplus was to be returned to the company. It was further agreed that the company should give either stock or

transportation notes in payment of materials furnished and work done, to each individual subscriber in proportion to his subscription.

Under this arrangement the committee collected about $6000 of the subscriptions, and have done work under the contract to the amount of $9950.72. Further work was suspended by reason of the insolvency of the company and the sheriff's sale of its property. The committee claim as creditors and contractors, and ask to be paid out of the proceeds of the sale.

In the distribution of the proceeds of the sale of the property of an insolvent corporation the court acts upon equitable principles. See Price's Appeal, 29 P. S. Smith 168, and cases there cited. We are, therefore, to ascertain whether these appellants have any equity to come in upon this fund to the exclusion of creditors who put their money into the enterprise in good faith.

Are they stockholders or are they creditors? In one sense a stockholder is a creditor of a corporation to the amount of his paid up stock. The corporation is his debtor to that extent. But his claim must necessarily be postponed until the general creditors are paid their demands in full. He holds his stock subject to their rights. The appellants are doubtless contractors in the sense of having graded a certain portion of the road at a price agreed upon. To this extent they are also creditors and entitled to be paid in some way. But how? The contract says in stock or transportation notes. The appellants assume they had the right to elect payment in transportation notes. The contract does not say so, and I am not sure but a tender by the company of either stock or transportation notes would have satisfied the covenant. This, however, is not material and is not decided. The appellants' contention is that inasmuch as the company by reason of its insolvency, and the sale of the road, cannot furnish transportation notes—it is bound to pay in money. As between the appellants and the company this proposition would appear to be correct. But just here the rights of creditors come in, and they say the appellants if not technically stockholders yet in equity must be treated as such, and be postponed until the general creditors of the company are paid in full.

There is great force in this suggestion. A stockholder is an owner of the property and franchises of a corporation to the extent of his stock. He is entitled in the same proportion to a share of the net earnings. If the appellants are stockholders it is too plain for argument they have no claim upon this fund. Have they any higher claim as holders of or as persons entitled to transportation certificates? While the status of such certificate-holders is not accurately defined in the books, we deem it clear that in equity they must be treated as part owners of the road. In one respect they have superior advantages over the owner whose title is represented by stock. The latter can receive only a share of the net earnings, while the holder of a transportation certificate is entitled

to a portion of the gross earnings. The right to participate in the earnings implies ownership to that extent in the thing which produces such earnings. The application of this equitable principle does exact justice in this case. The appellants had an interest in the completion of this road. They had subscribed with others to its capital stock. Instead of paying in money they paid in work and materials to the amount subscribed, and agreed to take stock or transportation notes for the amount of the contract over and above the amount of said subscriptions. There would be no justice in placing them in a better position than other friends and contributors to the enterprise who paid in money. The form of the transaction is nothing. Equity disregards mere form and looks only to the substance. The claim of the appellants was properly rejected.

2. BELL'S APPEAL. There is nothing in this appeal to require discussion. The appellant contracted to furnish 5000 railroad ties to the company to be used in the construction of the road. He now claims that he is a contractor and preferred creditor under the resolution of 1843. If his position be correct, then every storekeeper who furnished a pound of spikes to the company is a contractor for the construction of the road. No such absurd result as this was intended by the resolution of 1843.

3. HOPKINS'S APPEAL. This appeal is sustained upon a single point. The auditor awarded the sum of $371.85 to laborers and workmen employed by contractors for work and labor performed by them in the construction of the road. (See schedule E.) This was error. The joint resolution of the General Assembly of January 21st 1843, Pamph. L. 367, was intended, as its title implies, to protect laborers and contractors employed upon railroads, canals and other public works, and in order to give effect to such intent it declared that all assignments, conveyances, mortgages or other transfers of the property of such corporations should be null and void as against the claims of such persons. But by the very terms of the act its benefits are extended only to such laborers and contractors as have a contract relation with the company. Sub-contractors, and laborers employed by sub-contractors, are not within its protection. The auditor concedes this to be so, but held that the supplement of 4th April 1862, Pamph. L. 235, extended the protection of the resolution of 1843 to all contractors and laborers employed upon the work. It is true the two acts must be treated in *pari materia*. But the plain object of the Act of 1862 was to give a remedy to the persons named in the resolution of 1843. The mischief was that in the case of the sale or other transfer of a railroad in violation of the resolution of 1843, the contractors and laborers had a right to pursue the property in the hands of the purchaser, yet there was no adequate remedy to enforce such right. Accordingly the Act of 1862 provided that after obtaining

[Hart's Appeal.]

a judgment against the company a scire facias might issue upon said judgment with notice to the purchaser.  This gave the latter his day in court and enabled the creditor to sell and pass a good title.  The Act of 1862 did not enlarge the class of persons who are protected by the resolution of 1843.  That this is so clearly appears by the remedy therein provided.  It authorizes a scire facias to issue upon a judgment recovered against the company.  How could a sub-contractor, or a laborer employed by a sub-con-tractor, get a judgment against the company ?  He has no contract relation therewith.

What has been said applies to the case of sub-contractors as well as to the claims of laborers referred to in schedule E.  I do not, however, find that the auditor has allowed the claims of sub-con-tractors although error has been assigned thereto.  If I am mis-taken in this, the report must go back to the auditor for correction.  If not, the $371.85 in schedule E can be divided among the gen-eral creditors without further order.

> The decree of the court below is affirmed as to Brit Hart et al., appellants, in No. 271, October and November Term 1880, and also as to Haslett M. Bell, appellant, in No. 273 of the same term, and said appeals are dismissed at the costs of the respective appellants·; and the said decree is reversed as to James H. Hop-kins, appellant, in No. 299 of same term, and it is now ordered and decreed that the sum of $371.85, referred to in schedule E of the auditor's report be added to the fund for distribution among the gen-eral creditors, and divided among them pro rata ; that the costs of this last-named appeal be paid by the appellees, and that the said decree in all other respects be affirmed.